**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**
**GREEN BAY DIVISION**

| | |
|---|---|
| Eric R. Brant,<br><br>                Plaintiff,<br><br>v.<br><br>Schneider National, Inc., Schneider National<br>Carriers, Inc., Schneider Finance, Inc., & DOE<br>Defendants 1-10,<br><br>                Defendants. | Case No. 1:20-cv-01049-WCG<br>Judge William C. Griesbach |

## OPPOSITION TO MOTION FOR CONDITIONAL CERTIFICATION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................. 2

    I.      Schneider's Business ......................................................................................... 2

    II.     Formation of OO Relationship ......................................................................... 4

    III.    Schneider's Choice Portal ................................................................................ 5

    IV.    Settlement Process ........................................................................................... 5

    V.     Plaintiff and the Opt-In Declarants ................................................................. 6

    VI.    Other owner-operators ..................................................................................... 8

    VII.   The Proposed Collective ................................................................................ 12

ARGUMENT ................................................................................................................... 13

    I.      The Court Should Not Apply the Two-Step Lusardi Approach. ................... 13

    II.     Plaintiff's Motion Fails Even Under the Lusardi Approach. ........................ 14

    III.    Plaintiff's Motion is Not Supported by Admissible Evidence. ..................... 16

    IV.    The Proposed Collective Is Not Similarly-Situated With Respect to Employment Status Under the Economic Realities Test. ................................................ 17

        A.      Nature and degree of control ............................................................. 20

        B.      Opportunity for profit and loss .......................................................... 22

        C.      Investment in equipment or materials. ............................................... 23

        D.      Skill required ...................................................................................... 25

        E.      Permanency/duration .......................................................................... 26

    V.     Plaintiff's Proposed Collective Is Not Similarly-Situated With Respect to Alleged Minimum Wage Violations. ............................................................................ 27

        A.      Plaintiff presents no evidence that any collective member received less than minimum wage ................................................................................... 27

        B.      Whether any OO received less than minimum wage requires a highly individualized inquiry inappropriate for collective treatment. ............. 29

    VI.    Plaintiff's Cited Cases Are Inapposite. ........................................................ 32

    VII.   Plaintiff's Proposed Notice Is Improper ...................................................... 34

        A.      Requiring Schneider to deliver notice via its Platform Science system is unnecessary and disruptive. ............................................................... 34

        B.      A reminder is unnecessary. ................................................................ 35

        C.      Plaintiff's request for a 120-day opt-in period is unnecessary and unreasonable. 36

D. The language of Plaintiff's Notice should be revised to ensure the appearance of judicial neutrality. ................................................................ 37

E. The Court Should Not Issue Notice to Nearly a Decade's Worth of Former OOs. ................................................................................................................ 38

CONCLUSION ................................................................................................................ 40

## TABLE OF AUTHORITIES

<b>Page(s)</b>

**Cases**

*Adair v. Wis. Bell, Inc*.,
No. 08-CV-280, 2008 U.S. Dist. LEXIS 68942 (E.D. Wis. Sept. 11, 2008)................2, 14, 15

*Armstrong v. Wheels Assured Delivery Sys*.,
No. 1:15-cv-00354-SEB-MJD, 2016 U.S. Dist. LEXIS 43851 (S.D. Ind. Mar.
30, 2016) ..................................................................................................................28, 29, 32

*Blair v. TransAm Trucking, Inc.*,
309 F.Supp.3d 977 (D. Kan. 2018)........................................................................................24

*Blakley v. Celadon Grp., Inc*.,
No. 1:16-cv-00351-SEB-TAB, 2017 U.S. Dist. LEXIS 215944 (S.D. Ind. Oct.
18, 2017) ..........................................................................................................................29, 31

*Boyd v. Alutiiq Glob. Sols., LLC*,
No. 11-cv-0753, 2011 U.S. Dist. LEXIS 88656 (N.D. Ill. Aug. 8, 2011) ..............................16

*Brown v. Phenix Transp. W. Inc*.,
No. 3:13-cv-781-WHB-RHW, 2016 U.S. Dist. LEXIS 90113 (S.D. Miss. Mar.
31, 2016) ..........................................................................................................................36, 37

*Carter v. XPO Last Mile, Inc*.,
No. 16-cv-01231, 2016 U.S. Dist. LEXIS 137176 (N.D. Cal. Oct. 3, 2016) .........................32

*Christianson v. Newpark Drilling Fluids, LLC*,
No. H-14-3235, 2015 U.S. Dist. LEXIS 34088 (S.D. Tex. Mar. 19, 2015) .....................24, 25

*Clay v. New Tech Glob. Ventures, LLC*,
No. 16-296-JWD-CBW, 2019 U.S. Dist. LEXIS 34306 (W.D. La. Mar. 4,
2019) ......................................................................................................................................24

*Cotton-Thomas v. Volvo Grp. N. Am., LLC*,
20-cv-113, 2021 U.S. Dist. LEXIS 99752 (N.D. Miss. May 25, 2021) ..................................32

*Davis v. Colonial Freight Sys.*,
No. 3:16-CV-674-TRM-HBG, 2018 U.S. Dist. LEXIS 76225 (E.D. Tenn.
Apr. 30, 2018).........................................................................................................................34

*Davis v. Vanguard Home Care, LLC*,
2016 U.S. Dist. LEXIS 167098 (N.D. Ill. Dec. 5, 2016).........................................................39

*Derolf v. Risinger Bros. Transfer*,
   259 F. Supp. 3d 876 (C.D. Ill. 2017) ....................................................................25

*Doe 1 v. Swift Transp. Co.*,
   No. 2:10-cv-00899 JWS, 2017 U.S. Dist. LEXIS 26506 (D. Ariz. Feb. 24,
   2017) .........................................................................................................................35

*Elmy v. W. Express, Inc.*,
   No. 3:17-cv-01199, 2019 U.S. Dist. LEXIS 212412 (M.D. Tenn. Dec. 10,
   2019) .........................................................................................................................34

*Espenscheid v. DirectSat USA, LLC*,
   705 F.3d 770 (7th Cir. 2013) .......................................................................... 13, 31

*In re FedEx Ground Package Sys., Inc., Emp't Practices Litig.*,
   662 F. Supp. 2d 1069 (N.D. Ind. 2009) ....................................................18, 19, 26

*Flores v. Lifeway Foods, Inc.*,
   289 F. Supp. 2d 1042 (N.D. Ill. 2003) .................................................................32

*Flores v. Velocity Express, Inc.*,
   No. 12-cv-05790, 2013 U.S. Dist. LEXIS 77821 (N.D. Cal. June 3, 2013)..............32, 33

*Freeman v. Wal-Mart Stores, Inc.*,
   256 F. Supp. 2d 941 (W.D. Ark. 2003).................................................................15

*Fuller v. Jumpstar Enters., LLC*,
   No. H-20-1027, 2021 U.S. Dist. LEXIS 232709 (S.D. Tex. Dec. 6, 2021)............................31

*Gatdula v. Schneider Int'l, Inc.*,
   2012 WL 12884919 (C.D. Cal. Aug 21, 2012).....................................................36

*Henson v. Fid. Nat. Fin. Inc.*,
   300 F.R.D. 413 (C.D. Cal. 2014) .........................................................................39

*Hernandez v. JRPAC Inc.*,
   No. 14-civ.-4176, 2016 U.S. Dist. LEXIS 75430 (S.D.N.Y. June 9, 2016) ...........................29

*Hoffmann-La Roche, Inc. v. Sperling*,
   493 U.S. 165 (1989)................................................................................................34

*Hollins v. Regency Corp.*,
   867 F.3d 830 (7th Cir. 2017) ................................................................................15

*Huddleston v. John Christner Trucking*,
   LLC, No. 17-CV-549-GKF-FHM, 2018 U.S. Dist. LEXIS 73149 (N.D. Okla.
   May 1, 2018)............................................................................................................36

ii

*Jimenez v. GLK Foods LLC*,
No. 12-CV-209, 2016 U.S. Dist. LEXIS 69007 (E.D. Wis. May 23, 2016) ..........................29

*Jirak v. Abbott Labs., Inc.*,
566 F. Supp. 2d 845 (N.D. Ill. 2008) ...............................................................................16, 37

*Keller v. Miri Microsystems LLC*,
781 F.3d 799 (6th Cir. 2015) ...............................................................................................25

*Knauf Insulation, Inc. v. S. Brands, Inc.*,
820 F.3d 904 (7th Cir. 2016) ...............................................................................................39

*Messner v. Northshore Univ. HealthSystem*,
669 F.3d 802 (7th Cir. 2012) ...............................................................................................17

*Minter v. Wells Fargo Bank, N.A.*,
675 F. Supp. 2d 591 (D. Md. 2009) ......................................................................................39

*Mowdy v. Beneto Bulk Transp.*,
No. C 06-05682 MHP, 2008 U.S. Dist. LEXIS 26233 (N.D. Cal. Mar. 31,
2008) ....................................................................................................................................36

*Mull v. ARCO Durethene Plastics, Inc.*,
784 F.2d 284 (7th Cir. 1986) ...............................................................................................39

*Mullins v. Premier Nutrition Corp.*,
2019 U.S. Dist. LEXIS 229365 (N.D. Cal. Dec. 17, 2019)....................................................38

*Nehmelman v. Penn Nat'l Gaming, Inc.*,
822 F. Supp. 2d 745 (N.D. Ill. Sept. 29, 2011)......................................................................16

*Pfaahler v. Consultants for Architects, Inc.*,
Cause No. 99 C 6700, 200 U.S. Dist. LEXIS 1772 (N.D. Ill. Feb. 8, 2000) ..........................19

*Pfaahler v. Consultants for Architects*,
No. 99 C 6700, 2000 U.S. Dist. LEXIS 1772 (N.D. Ill. Feb. 11, 2000)............................27, 28

*Rego v. Liberty Mut. Managed Care LLC*,
No. 17-C-66, 2017 U.S. Dist. LEXIS 225448 (E.D. Wis. Aug. 23, 2017).......................35, 36

*Rosado v. Gonzalez*,
832 F.3d 714 (7th Cir. 2016) ...............................................................................................40

*Rottman v. Old Second Bancorp, Inc.*,
735 F. Supp. 2d 988 (N.D. Ill. 2010) ....................................................................................16

*Russell v. Illinois Bell Telephone Co.*,
575 F. Supp. 2d 930 (N.D. Ill. 2008) ....................................................................................38

iii

*Schroeder v. Humana Inc.*,
  No. 12-C-0137, 2012 U.S. Dist. LEXIS 168759 (E.D. Wis. Nov. 27, 2012) .........................36

*Scott v. NOW Courier, Inc.*,
  No. 1:10-cv-971, 2012 U.S. Dist. LEXIS 43710 (S.D. Ind. Mar. 29, 2012) ..............19, 20, 28

*Sec'y of Labor, United States Dep't of Labor v. Lauritzen*,
  835 F.2d 1529 (7th Cir. 1987) ...............................................................................................18

*Soler v. G. & U., Inc.*,
  833 F. 2d. 1104 (2d Cir. 1987)................................................................................................30

*Spellman v. Am. Eagle Express, Inc.*,
  No. 10-1764, 2013 U.S. Dist. LEXIS 35032 (E.D. Pa. Mar. 14, 2013)...................................24

*Swales v. KLLM Transp. Servs.*
  LLC, No. 19-60847, 985 F.3d 430 (5th Cir. Jan. 12, 2021) ...........................................13, 14

*Vargas v. HEB Grocery Co., LP*,
  No. SA-12-CV-116-XR, 2012 U.S. Dist. LEXIS 132030 (W.D. Tex. Sep. 17,
  2012) .......................................................................................................................................27

*Williams v. Angie's List, Inc.*,
  223 F. Supp. 3d 779 (S.D. Ind. 2016) ....................................................................................17

*Witteman v. Wis. Bell, Inc.*,
  No. 09-cv-440-vis 1, 2010 U.S. Dist. LEXIS 8845 (W.D. Wis. Feb. 2, 2010) ................36, 38

*Woods v. New York Life Ins. Co.*,
  686 F.2d 578 (7th Cir. 1982) ....................................................................................15, 34, 37

*Wynn v. Express, LLC*,
  No. 11 C 4588, 2012 U.S. Dist. LEXIS 34023 (N.D. Ill. Mar. 14, 2012) ..............................35

**Statutes**

29 U.S.C.A. § 216(b) ......................................................................................................................27

FLSA...........................................1, 13, 15, 18, 27, 28, 29, 30, 31, 32, 34, 36, 38, 39, 40

**Rules**

Rule 23 .........................................................................................................................13, 27, 33

Rule 23(f).......................................................................................................................................38

**Other Authorities**

29 C.F.R. § 531.35 ..................................................................................................................29, 30

B. Blackburn Dec. ¶¶ 4, 7, 10, 11. In 2022 .................................................................9

L. Bethea Dec. ¶ 24 ......................................................................................................24

L. Bethea Dec. ¶ 45 ........................................................................................................7

Maurice B. Trucking LLC. L Bethea Dec. ¶ 45 .............................................................7

Pltf's Mem., Dkt. 105 ...................................................................................................19

Qualcomm. *Swift Transportation* .................................................................................35

SNBC. L. Bethea Dec. ¶ 44 ...........................................................................................6

## <u>INTRODUCTION</u>

While the standard for conditional certification under the FLSA has been described as "lenient," there <u>is</u> a standard, and Plaintiff fails to satisfy it. Plaintiff asks the Court, based on his own anecdotal experience and the copied-and-pasted declarations of six disgruntled former drivers, to send notice to a nationwide collective of thousands of independent owner-operators who have hauled loads for Schneider since 2013, many of whom may never have experienced a minimum wage violation, even assuming for the sake of argument that they had been misclassified, and for whom an individualized inquiry would be necessary to determine if they were. His motion must be denied, first, because he is not similarly-situated to this huge, diverse collective in respect to the fact-intensive economic realities test that the Seventh Circuit has held to determine employee status. Based on this standard, for which Plaintiff advocated, the collective varies wildly in terms of 1) the nature and degree of alleged control of the drivers; 2) opportunity for profit or loss depending upon managerial skill; 3) investment in equipment or materials; 4) whether the service requires special skill; and, 5) the permanency and duration of the relationship.

Even if Plaintiff had established a nexus connecting him to the collective as to employee status, Plaintiff cannot show minimum wage violations on a collective basis. Even if every individual to whom Plaintiff seeks to send notice had in fact been misclassified, whether and when any were not paid minimum wage is not possible to determine collectively. It would require auditing each driver's gross settlement payment, deductions, and hours-of-service to identify minimum wage violations. This inquiry is necessary to establish <u>liability</u>, not damages, and the evidence in support of Plaintiffs' and the collective's claims will differ from week to week, and driver to driver.

Plaintiff's Motion should be denied, consistent with this Court's observation that "[i]t would be a waste of the Court's and the litigants' time and resources to notify a large and diverse

class only to later determine that the matter should not proceed as a collective action because the class members are not similarly situated." *Adair v. Wis. Bell, Inc.*, No. 08-CV-280, 2008 U.S. Dist. LEXIS 68942, at *9 (E.D. Wis. Sept. 11, 2008).

## FACTUAL BACKGROUND

### I.  Schneider's Business

Schneider National Carriers, Inc. ("SNC") is a federally authorized interstate motor carrier. SNC's business started in 1935 when Al Schneider sold the family car to buy his first truck. Declaration of Lamar Bethea ("L. Bethea Dec.") ¶ 3.[1]  Eighty-seven years later, SNC transports over 9 million freight miles each day for over 8,000 customers.  SNC and its affiliated companies (collectively, "Schneider") have more than 16,000 employees, including drivers and office associates.  In addition, SNC contracts with more than 1,800 independent owner-operators.  *Id.*

Like many common carriers, SNC transports freight using company-owned trucks as well as trucks that are leased to SNC by independent businesses or individuals who, in turn own or lease such trucks.  *Id.* ¶ 4.   SNC enters into fixed-term Owner-Operator Operating Agreements ("OOOAs") with these independent contractor owner-operators ("OOs").  *Id.* ¶ 7.  Because OOs are mobile, SNC sends the draft OOOAs electronically – to the email addresses provided by OOs – so OOs can review and, as they deem appropriate, e-sign the OOOA.  *Id.* ¶ 8.  The OOOAs

---

[1] This Opposition is supported with the following exhibits: Ex. 1 Declaration of Lamar Bethea ("L. Betha Dec.") (Ex. 1A Trip Lease Form; Ex. 1B OOOA with Maurice B Trucking, LLC; Ex 1C OptIn Spreadsheet); Ex. 2 Declaration of Steve Branham ("S. Branham Dec."); Ex. 3 Declaration of M. Thompson ("M. Thompson Dec.") (Ex. 3A E. Brant application materials; Ex. 3B T. Campbell application materials; Ex. 3C B. Minor application materials; Ex. 3D S. Rich application materials; Ex. 3E J. Tate application materials; Ex. 3F J. Baldwin application materials); Ex. 4 Declaration of Todd Wetenkamp ("T. Wetenkamp Dec."); Ex. 5 Declaration of Lafon Bethea ("Lafon Bethea Dec."); Ex. 6 Declaration of Brian Blackburn ("B. Blackburn Dec."); Ex. 7 Declaration of Michael Adams ("M. Adams Dec."); Ex. 8 Declaration of Terry Sledge ("T. Sledge Dec."); Ex. 9 Declaration of Steve Williams ("S. Williams Dec."); Ex. 10. Declaration of Kenneth Newell ("K. Newell Dec."); Ex. 11 Declaration of Mike Snyder ("M. Snyder Dec."); Ex. 12 Declaration of Brian Feltz ("B. Feltz Dec."); Ex. 13 Declaration of Greg Cornelius ("G. Cornelius Dec.") (Ex. 13A E. Brant Settlement Statement); Ex. 14 Declaration of Tammy Carpenter ("T. Carpenter Dec.") (Ex. 14A E. Brant Driver Logs).

allocate the expenses associated with operating the truck and paying the driver or drivers who operate the truck, as well as the compensation SNC will pay the OO for hauling freight. *Id.* ¶ 7.

SNC contracts with OOs in its Van/Truckload ("VTL") and Intermodal divisions. *Id.*[2] ¶ 14. SNC currently contracts with approximately 1,800 owner-operators in VTL. *Id.* VTL owner-operators select freight from Schneider's Choice Portal (described in more detail below) to haul over the road, according to the locations and business needs of SNC's clients. *Id.* ¶¶ 14-15. SNC currently contracts with five OOs in its Intermodal Division, although the number has historically varied and was a high as 41 OOs in 2015. *Id.* ¶ 16.

In addition, Schneider National Bulk Carriers, Inc. ("SNBC") contracts with OOs to transport bulk commodities such as liquid chemicals. *Id.* ¶ 17. SNBC is a separate entity, and a different DOT operating authority, than SNC. *Id.* Bulk OOs use equipment and require skills that VTL or intermodal drivers do not, specifically to connect and use hoses, pumps, and compressors and climb on and off bulk tankers in order to load and unload bulk liquid chemicals which often includes hazardous material. *Id.* ¶ 18. SNBC currently contracts with roughly 45 OOs, but the number has historically varied and was as high as 120 in 2019. *Id.* ¶ 17.

As intermodal, bulk, and VTL freight and routes differ, so do earnings opportunities. *Id.* ¶ 19. Due to the random, vast nature of van truckload freight, VTL owner-operators typically will have higher volume of loads to choose from as compared to intermodal OOs, and more opportunities to connect multiple loads into longer, more profitable runs, subject to DOT hours of service regulations and the OO's own schedule *Id.* Bulk OOs are more technically skilled and bulk loads can offer higher margins than ordinary freight. *Id.*

---

[2] The VTL Division transports truckloads of shipments from point to point throughout the United States. OOs in the VTL Division typically drive tractor-trailers on a national or regional basis. The Intermodal Division transports shipments to and from an intermodal facility where goods are off loaded from rail lines so OOs in the Intermodal Division often operate in and closer to rail yards.

SNC and SNBC use the services of OOs throughout the continental United States. *Id.* ¶ 23. Earnings opportunities can vary depending on the geographic regions in which an OO chooses to operate. *Id.* In the Northeast and Mid-Atlantic regions, for example, pick ups and drop offs tend to be closer together, offering higher potential profit for OOs with the skill to select and schedule multiple loads and pick and drop them efficiently in a relatively short timeframe. *Id.* In the South and Midwest, routes tend to be longer and offer higher profits for OOs with freedom, or desire, to remain on the road longer and who can effectively manage their fuel and other operating costs. *Id.*

Schneider Finance, Inc. ("SFI") is a separate legal entity that leases commercial motor vehicles to OOs. An OO need not lease from SFI to contract with SNC or SNBC. *Id.* ¶ 20. Many SFI customers drive their leased equipment for Schneider competitors. Today, roughly 56% of SNC OOs have an active lease with SFI. *Id.* ¶ 21. The rest of SNC's owner-operators lease tractors from entities other than SFI, or own their trucks outright.

## II.     Formation of OO Relationship.

Schneider goes through a diligence process before it offers a contractual opportunity to a prospective OO. For example, Schneider seeks prospective OOs that have at least six months experience driving a commercial motor vehicle. *Id.* ¶ 11. OOs have different levels of formal education. *Id.* ¶ 12. Some OOs have college degrees, some have advanced degrees, and others have a high school diploma or GED. *Id.* OOs also have different levels of business experience. Some OOs have none, while others have operated their own business or multiple businesses (including, but not limited to, over-the-road trucking businesses) before joining SNC. *Id.* ¶ 13.

SNC provides the driver with an orientation and training on how to select loads from SNC's Choice Portal. *Id.* ¶ 26. SNC does not provide training to the driver on how to drive or pick up and drop loads, as OOs are expected to already possess these skills. *Id.* ¶ 27.

### III.    <u>Schneider's Choice Portal</u>

Schneider's online Choice Portal offers OOs the ability to customize their own operations, routes and schedules based on the types of freight that they want to select. Declaration of Steve Branham ("Branham Dec.") ¶ 6. An OO inputs its location, earliest pickup availability, and radius they are willing to drive to pick up freight. Branham Dec. ¶ 7. The Choice platform populates a list of options that includes delivery and drop-off appointment times, weight, and rate. *Id.* ¶ 8. OOs are not required to haul any freight – but when an OO does want to haul freight, the OO has the freedom to select any of the available loads shown on the Choice Portal.

When an OO identifies a load to deliver, the OO can select and confirm the freight via the Choice Portal. *Id.* ¶ 10. Owner-operators may schedule one or more shipments in advance, which can help for assigning themselves the most advantageous freight and planning for return trips. *Id.* ¶ 11. The Choice platform can be accessed via a computer, tablet, or smartphone, 24/7. *Id.* ¶ 12. Schneider adds thousands of loads to the Choice platform daily. *Id.* ¶ 13.

Owner-operators may log on to view and select freight as often, or as infrequently, as they like. *Id.* ¶ 14. Schneider does not require OOs to log on or select freight regularly, or at all. *Id.* An OO may choose as many or as few loads from the Choice platform as she likes. *Id.* Some OOs enlist spouses or employees to assist them in managing loads.[3]

### IV.    <u>Settlement Process</u>

About 30% of VTL OOs have a contractual agreement whereby they gross 65% of the Line Haul Rate (what the customer pays SNC) for any loads selected from the Choice Portal, as well as 100% of any fuel surcharges and 100% of select accessorial payments from the customer. L. Bethea Dec. ¶ 31.

---

[3] *See, e.g.*, B. Blackburn Dec. ¶ 33.

The other 70% of VTL OOs have a different contractual agreement with SNC: these OOs are part of SNC's "all in revenue" program. *Id.* ¶ 32. Rather than providing a set percentage of revenue, these OOs have visibility – on the Choice Portal – to an "all in revenue" amount that varies for each and every load shown according to market conditions. *Id.* From the gross revenue earned, Schneider deducts certain amounts as provided in the OOOA, including any SFI lease payments, fuel, taxes, insurance, tolls, and cash advances requested by the OO. *Id.* ¶ 33.

OOs' operations vary widely; indeed, OOs choose whether to drive, and if so, how much to drive, in any given week. *Id.* ¶ 34. OOs log their hours of service (driving, not driving/on-duty, and off duty) to comply with DOT hours of service regulations, but not for compensation purposes. *Id.* ¶ 35. Thus, each owner-operator's earnings and hours of service vary by settlement period, depending on loads they hauled and when they chose to work, among other things.

## V.     **Plaintiff and the Opt-In Declarants**

Plaintiff and six former OOs (the "Opt-In Declarants") have submitted copied-and-pasted declarations. Plaintiff Eric Brant, according to his application materials, drove for a number of companies over more than a decade before applying to be an OO in Schneider's VTL division in November, 2018. M. Thompson Dec. Exh. A. Mr. Brant signed an OOOA and, separately, a SFI Lease in December, 2018. L. Bethea Dec. ¶ 43. He terminated his relationship with SNC in August 2019. *Id.* Mr. Brant drove for SNC for nine months.

Thomas Campbell, according to his application materials, was a truck driver for more than four years before becoming an employee driver for Schneider. M. Thompson Dec. Exh. B. After over a year as an employee driver, Mr. Campbell applied to become an OO with SNBC. L. Bethea Dec. ¶ 44. Mr. Campbell entered into his SFI Lease and separate OOOA through the business entity CThomaso II LLC. *Id.* Mr. Campbell drove for SNBC from March 2018 until June 2020. *Id.* Mr. Campbell was an OO for just over two years.

Brian Minor was an OO in SNC's VTL division.  L. Bethea Dec. ¶ 45.  Mr. Minor drove for Courier Express and CR England before applying with SNC.  M. Thompson Dec. Exh. C.  Mr. Minor entered into his SFI lease and SNC OOOA in June 2017 through the business entity Maurice B. Trucking LLC.  L Bethea Dec. ¶ 45.  He put a $1,400 down payment on his truck.  *Id.* Exh. C.  SNC discontinued its contractual relationship with Mr. Minor in May 2019 after he was involved in three preventable accidents.  *Id.* ¶ 45.

Jeremy Baldwin was a truck driver for about four years for seven different companies before he applied to be an OO with SNC.  M. Thompson Dec. Exh. F. Mr. Baldwin signed an OOOA with SNC in November 2017.  L. Bethea Dec. ¶ 46.  In May 2018, Mr. Baldwin ended his OOOA with SNC and he decided to take his SFI-leased truck to deliver for Schneider competitor Crete Carriers.  *Id.*  Mr. Baldwin's CDL was later revoked, and he defaulted on his SFI Lease and returned his truck to SFI.  *Id.*

David Collins worked in the trucking industry for 9 years as an employee and 24 years as an independent contractor before coming to Schneider.  D. Collins Dec. (Plf. Exh. 7) ¶ 10.   Mr. Collins leased his truck to Schneider first in 2009-2010, and then again from April 2017 to September 2022.  L. Bethea Dec. ¶ 47.  Mr. Collins put down $3,000 cash on his SFI lease.  *Id.* Exh. C.  Mr. Collins paid off his SFI lease in August, 2022.  *Id.* Mr. Collins then ended his contractual relationship with SNC and, instead, took his (now owned) truck to contract with Warren Transportation.  *Id.*

Jocelyn Tate was a school bus driver for over four years and a truck driver for about two-and-a-half years before entering into a OOOA with SNC.  M. Thompson Dec. Exh. E.  Ms. Tate signed an OOOA with SNC in December 2020 through the entity Heavenly Hands Too LLC.  L.

Bethea Dec. ¶ 48. She placed a $1,900 down payment on her truck. *Id.* Exh. C. Ms. Tate defaulted on her lease and SFI repossessed her truck in January 2022. *Id.* ¶ 48.

Sirena Rich was an OO for SNBC from October 2018 to April 2019. *Id.* ¶ 49. Ms. Rich was a bus driver prior entering into an OOOA with SNC. M. Thompson Dec. Exh. D. In April 2019, Ms. Rich took her SFI-leased truck to Bosso America Corporation. L. Bethea Dec. ¶ 49.

## VI. __Other owner-operators__

Many members of Plaintiff's proposed collective do not share the purported experiences of Plaintiff and his handful of disgruntled former OOs.

Todd Wetenkamp has been an independent owner-operator driver for over thirty years, for multiple carriers. Wetenkamp Dec. ¶¶ 3, 12. Mr. Wetenkmap has a Bachelor's Degree and has nearly completed a Master's Degree. *Id.* ¶¶ 10, 11. In 2018, Mr. Wetenkamp signed a lease with SFI and signed an OOOA with SNC. *Id.* ¶¶ 4, 5. Mr. Wetenkamp carefully reviewed the Lease and OOOA. *Id.* ¶¶ 6, 7. Mr. Wetenkamp chooses which loads, if any, he will deliver, what hours he will work to accomplish the deliveries, and how to load and unload the freight, and he has negotiated more favorable trailer drop fees and relay fees from SNC. *Id.* ¶ 7, 18, 20. Mr. Wetenkamp manages his profitability by looking at revenue per load, rather than average mileage revenue. *Id.* ¶ 27. He looks for loads that allow him to travel from his home in Wisconsin to his home in Florida. *Id.* ¶ 27. Mr. Wetenkamp manages his speed to conserve fuel and increase profitability. *Id.* ¶ 31. Mr. Wetenkamp has discretion in when to take time off and how much time to take off. *Id.* ¶ 21. For example, Mr. Wetenkamp took three months off in 2022 to care for his wife. *Id.* ¶ 22. He is not in regular contact with SNC or SNC's dispatchers. *Id.* ¶ 16. Mr. Wetenkamp has carried passengers without repercussions. *Id.* ¶ 24.

Lafon Bethea drove as an independent contractor for SNC from 1991 to 2008. Lafon Bethea Dec. ¶ 4-7. Before entering the trucking industry, Mr. Bethea served in the United States

Army and was a Highway Patrolman. *Id.* ¶¶ 13, 14. In 2008 he ended his relationship with SNC and became an Owner-Operator for Waggoners Trucking, and then Dixon Auto Transport. *Id.* ¶ 7. Mr. Bethea signed on again with SNC in 2020, through a business entity, PLB Trucking LLC. *Id.* ¶¶ 10, 15. Mr. Bethea signed a Lease with SFI in 2021, although he had credit and resources sufficient to purchase a truck or lease it elsewhere. *Id.* ¶¶ 9, 17. Mr. Bethea chooses loads to work three or four weeks at a time, and then take three or four days off in a row. *Id.* ¶ 18.

Brian Blackburn leased a truck from SFI and signed an OOOA with SNC in April 2019, after 28 years driving in the military and 1.5 years driving for another carrier. B. Blackburn Dec. ¶¶ 4, 7, 10, 11. In 2022, Mr. Blackburn traded in his truck and signed a new Lease with SFI. *Id.* ¶ 12. Mr. Blackburn has invested in his business by purchasing, among other things, a smart phone, weather equipment, a fifth wheel puller, and various tools. *Id.* ¶ 19. He also pays for his own business accounting service. *Id.* ¶ 46. Mr. Blackburn drives his own truck but sometimes has his wife help him pick freight. *Id.* ¶ 33. Mr. Blackburn decides which loads, if any, to select from the Choice Portal, and which hours to work every day to deliver them. *Id.* ¶¶ 23, 24, 26. Mr. Blackburn prefers to select loads that take him from Texas, to Pennsylvania, to Florida, and back to Texas, and he prefers to stay in the South and avoid inclement weather in winter. *Id.* ¶ 27. On occasion, Mr. Blackburn has negotiated with SNC to take loads not offered on the Choice Portal. *Id.* ¶ 40. In 2021, Mr. Blackburn made roughly $145,000 in gross revenue and took home roughly $80-85,000 in net profit. *Id.* ¶ 51.

Michael Adams has been an independent owner-operator for over 23 years. M. Adams Dec. ¶ 3. He has financed seven trucks through SFI and plans to finance an eighth. *Id.* ¶ 9. Mr. Adams trades in his trucks roughly every three years, which reduces maintenance costs. *Id.* ¶ 10. He typically obtains repairs from the manufacturer's designated repair shops and get regular

maintenance at non-SNC facilities such as Goodyear. *Id.* ¶ 41. Mr. Adams began leasing from SFI in 2003. He has had OOOAs with SNC since 2003, except that from 2010 to 2014 he chose to drive his SFI-leased truck for an SNC competitor, Dart Transit. *Id.* ¶ 26. It is not uncommon for him to choose to drive for 5-6 weeks, then spend a week at home. *Id.* ¶ 23.

Terry Sledge has been an OO for SNC, and has leased from SFI, since 2001. T. Sledge Dec. ¶¶ 6, 8. He has sufficient resources to purchase a truck or lease it elsewhere but chooses to lease from SFI. *Id.* ¶ 11. By pre-assigning loads on the Choice Portal, Mr. Sledge plans routes that take him from his home in Georgia to New York or Maine and back. *Id.* ¶ 22. He is comfortable driving in the winter in the northern United States but avoids the South in the winter and avoids "deadheading" more than 100 miles. *Id.* ¶¶ 23, 24. He has carried his sons as passengers in his truck. *Id.* ¶ 30.

Steve Williams obtained his CDL in 2008 and started his own trucking business in 2014, selling his car to put a down payment on a commercial tractor. Williams Dec. ¶ 8. He formed Express Logix, LLC and signed an OOOA with Schneider. *Id.* ¶ 11, 12. in 2017, Mr. Williams acquired a second truck, which he sometimes drives for Schneider but sometimes leases to other carriers including ELE Logistics. *Id.* ¶ 13-14. Mr. Williams hires and contracts with workers to run his back office and operate his two trucks. *Id.* ¶¶ 17, 35.

Kenneth Newell has been driving under OOOAs with Schneider since 2011. K. Newell Dec. ¶ 4. He owns his tractor. *Id.* ¶ 5. He manages his schedule to leave home on Monday and return home to Mississippi nine days later, then departs again the next Monday. *Id.* ¶ 10.

Mike Snyder operated a series of restaurants before entering the trucking industry, where has been a trucking owner-operator for more than 20 years. M. Snyder Dec. ¶ 2. He invested $146,000 in his own truck. *Id.* ¶ 16. Mr. Snyder selects lightweight loads, such as chips and paper

products, from Schneider's Choice Portal and prefers to drive in the Southeast and Mid-Atlantic states. *Id.* ¶ 14. When Schneider does not offer sufficiently profitable loads, he focuses his time on his commercial pressure-washing business *Id.* ¶ 28.

Mr. Bethea, Mr. Wetenkamp, Mr. Blackburn, Mr. Adams, and Mr. Sledge leased trucks from SFI and are members of the proposed collective. But they – and Mr. Williams, Mr. Newell, and Mr. Snyder – have had very different experiences than Plaintiff or the Opt-In Declarants:

- They have discretion in loads to select, routes to take, and how to park, hook, load, and unload freight; Newell Dec. ¶¶ 14, 15; Williams Dec. ¶ 18; Wetenkamp Dec. ¶¶ 17-18; Blackburn Dec. ¶¶ 23-24; Lafon Bethea Dec. ¶¶ 31-33; Sledge Dec. ¶¶ 15, 21; Adams Dec. ¶¶ 10, 17

- They were not provided with training in how to pick up, drop, or transport freight, and had no need of such training; Newell Dec. ¶ 11; Williams Dec. ¶ 25; Wetenkamp Dec. ¶ 14; Blackburn Dec. ¶ 20; Lafon Bethea Dec. ¶ 21; Sledge Dec. ¶ 14; Adams Dec. ¶ 15;

- They have not been disciplined for violating any Schneider policies, and are not in regular contact with Schneider or its dispatchers; Newell ¶¶ 12, 13; Williams Dec. ¶¶ 27, 28; Blackburn Dec. ¶¶ 21-22; Lafon Bethea Dec. ¶¶ 22-23; Sledge Dec. ¶¶ 18, 19; Adams Dec. ¶¶ 18, 19;

- They take time off at their discretion, without repercussions from Schneider; Newell Dec. ¶ 18; Williams Dec. ¶ 33; Wetenkamp Dec. ¶¶ 20-21; Blackburn Dec. ¶¶ 30-31; Lafon Bethea Dec. ¶ 28; Sledge Dec. ¶ 25; Adams Dec. ¶ 24;

- They are free to hire other drivers; Newell Dec. ¶ 20; Williams Dec. ¶ 35; Adams Dec. ¶ 25;

- They are free to, and do, carry passengers in their trucks; Newell Dec. ¶ 21; Williams Dec. ¶ 36; Wetenkamp Dec. ¶ 24; Blackburn Dec. ¶ 34; Sledge Dec. ¶ 29

- They are free to choose whatever loads they believe will provide the earning opportunities and lifestyle they desire; Newell Dec. ¶ 23-25; Williams Dec. ¶¶ 19, 29, 30; Sledge Dec. ¶¶ 31-33; Adams Dec. ¶¶ 30-31;

- They maintain and repair their own trucks using mechanics of their choosing, not necessarily Schneider's; Newell Dec. ¶ 32; Williams Dec. ¶¶ 46, 47; Wetekmap Dec. ¶ 24; Blackburn Dec. ¶ 48; Sledge Dec. ¶ 40; Adams Dec. ¶ 41

- They had the opportunity to review their Lease Agreements and OOOAs with an attorney if they wished; Blackburn Dec. ¶ 13; Wetenkamp Dec. ¶ 6;

- They negotiate terms with Schneider; Wetenkamp Dec. ¶ 7; Blackburn Dec. ¶ 40;

- They pay their own business expenses such as fuel, fuel taxes, permits, and other licenses; Wetenkamp ¶ 30; Blackburn Dec. ¶¶ 41-42; Lafon Bethea Dec. ¶¶ 34-35; Sledge Dec. ¶ 37; Adams Dec. ¶¶ 36, 37

- They generate anywhere from $130,000 to $200,000 in annual gross revenue, and bring home anywhere from $50,000 to $90,000 in profit per year; Newell Dec. ¶ 34; Williams Dec. ¶ 41; Blackburn Dec. ¶ 51; Adams Dec. ¶ 44.

These drivers choose to be owner-operators because it gives them more control over their work and the opportunity to make more money. Wetenkamp ¶¶ 7, 43; Blackburn Dec. ¶¶ 9, 50; Lafon Bethea Dec. ¶¶ 12, 43; Sledge Dec. ¶¶ 6, 5,27, 44; Adams Dec. ¶¶ 7, 33, 43. They understand that owning their own businesses involves both risk and reward and that they need to operate their businesses properly in order to make money. Wetenkamp ¶ 45; Blackburn Dec. ¶¶ 52; Lafon Bethea Dec. ¶¶ 44; Sledge Dec. ¶ 43; Adams Dec. ¶¶ 45.

## VII.  **The Proposed Collective**

One hundred twenty-two individuals have filed Consents to Sue (the "Opt-In Plaintiffs"). A spreadsheet with these individuals' SFI Lease status, Lease down payments, Lease payments, current motor carrier, and tenure with Schneider is attached as Exhibit C to the Declaration of Lamar Bethea. Like the OOs described above, the Opt-In Plaintiffs have diverse experiences:

- 8 Opt-In Plaintiffs never leased a truck from SFI, so they are not part of Plaintiff's proposed collective at all;[4]

- 34 Opt-In Plaintiffs (30%) had a lease with SFI, paid it off in full, and now own their own trucks;

- 7 Opt-In Plaintiffs chose to turn their truck in to SFI for its residual value;

- 38 Opt-In Plaintiffs (33%) lease from SFI but currently drive for a carrier other than SNC or SNBC;

---

[4] Plaintiff changed his proposed collective to only include drivers who leased trucks from SFI.

- The Opt-In Plaintiffs who leased from SFI placed down payments on their trucks ranging from $0 up to $14,000;

- Their monthly SFI lease payments ranged from $569.86 to $1,825.00;

- Their tenures with Schneider range from two months to more than more than 16 years;

- They hail from 29 states;

- Only 11 Opt-In Plaintiffs currently have an active lease with SFI.

L. Bethea Dec. Exh. C.

From January 1, 2020 through October 5, 2022, approximately 75% (4,562/6,037) of parties who signed new or renewal OOOAs with SNC or SNBC did so as an LLC, Corporation, or Limited Partnership. *Id.* ¶ 24. The other 25% signed as a sole proprietor, or sole proprietor with DBA moniker. *Id.*

The collective also varies widely in profitability. Plaintiff claims he lacked opportunity for profit, but the collective would include highly profitable OOs with annual net profits in excess of $150,0000. *See* B. Feltz Dec. Exh. A (highest net earnings by single-truck drivers, 2018-22).

## **ARGUMENT**

### I. **The Court Should Not Apply the Two-Step *Lusardi* Approach.**

Although courts traditionally have followed the two-step *Lusardi* approach to FLSA collective certification, this approach is not appropriate for this case. The Fifth Circuit recently opined that a district court erred by applying the *Lusardi* approach where economic realities were at issue under the FLSA.[5] *Swales v. KLLM Transp. Servs.* LLC, No. 19-60847, 985 F.3d 430, 434

---

[5] The Seventh Circuit has also suggested that the proper standard for FLSA Certification is quite similar to that for a Rule 23 class: "despite the difference between a collective action and a class action and the absence from the collective-action section of the Fair Labor Standards Act of the kind of detailed procedural provisions found in Rule 23, there isn't a good reason to have different standards for the certification of the two different types of action, and the case law has largely merged the standards, though with some terminological differences. *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 772 (7th Cir. 2013) (internal citation omitted).

(5th Cir. Jan. 12, 2021). "[A]pplying Lusardi was inappropriate because the threshold issue here depends on the economic-realities test, which asks how much control the employer had over the independent contractor. Thus, the district court needed to consider the evidence relating to this threshold question in order to determine whether the economic-realities test could be applied on a collective basis. If answering this question requires a highly individualized inquiry into each potential opt-in's circumstances, **the collective action would quickly devolve into a cacophony of individual actions**." *Id.* (emphasis added). "When a district court ignores that it can decide merits issues when considering the scope of a collective, it ignores the 'similarly situated' analysis and is likely to send notice to employees who are not potential plaintiffs. In that circumstance, the district court risks crossing the line from using notice as a case-management tool to using notice as a claims-solicitation tool. *Hoffman-La Roche* flatly forbids such line crossing." *Id.* at 442. The Court should refuse to apply any lower initial standard for conditional certification, and instead should "rigorously enforce" the FLSA's similarity requirement. 985 F.3d at 443. Under a rigorous enforcement standard, the collective cannot be certified.

## II. Plaintiff's Motion Fails Even Under the *Lusardi* Approach.

Should the court follow the two-step *Lusardi* approach, Plaintiff's motion still fails. This Court has followed the two-step *Lusardi* approach to determine whether the representative plaintiff is "similarly situated" to potential opt-in plaintiffs. *Adair v. Wis. Bell, Inc.*, No. 08-CV-280, 2008 U.S. Dist. LEXIS 68942, at *6-7 (E.D. Wis. Sept. 11, 2008). During the first step, the court must determine whether the plaintiff has demonstrated a "reasonable basis" for believing that she is similarly situated to potential class members. *Id.* If so, notice may be sent to other potential members of the class. *Id.* Then, typically upon a defense motion for decertification at the close of discovery, the court proceeds to step two, at which point it must determine whether plaintiffs who have opted in are, in fact, similarly situated. *Id.* At the first stage, the plaintiff must make "at least

14

a modest factual showing that such collective action is appropriate." *Id.*, at *9. The conditional certification stage is not a "mere formality." *Id.*

"[T]he court must . . . assure itself that the employees identified are raising similar FLSA claims. In exercising this power, district courts do not hesitate to pare down the group or to deny conditional certification altogether." *Hollins v. Regency Corp.*, 867 F.3d 830, 834 (7th Cir. 2017). Because a plaintiff's "discovery demands upon conditional certification may impose a 'tremendous financial burden to the employer,'" courts must be careful to guard against wasting the parties' time and resources where certification is not appropriate at the outset. *Adair*, 2008 U.S. Dist. LEXIS 68942, at *10 (quoting *Woods v. New York Life Ins. Co.*, 686 F.2d 578, 581 (7th Cir. 1982)). Thus, where the plaintiff has not made "at least a modest factual showing that certification is appropriate, 'it would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action because the class members are not similarly situated.'" *Id.* (quoting *Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003)).

Here, as discussed below, Plaintiff Brant and the Opt-in Declarants are not similarly situated to each other, let alone to other proposed collective members. Conditional certification is not appropriate where the Plaintiff is demonstrably dissimilar to the collective he purports to represent. Here, members of the proposed collective vary wildly with respect to the factors that determine employee status. Conditional certification should be denied on this basis alone.

Even assuming, *arguendo*, Plaintiff had established a factual nexus connecting him to the collective as to employee status, Plaintiff cannot demonstrate minimum wage violations on a collective basis. Even if every individual to whom Plaintiff seeks to send notice had in fact been misclassified, whether and when any of them were not paid federal minimum wage is not possible

to determine on a collective basis. The Court would need to audit each driver's gross settlement payment, settlement deductions, and hours-of-service logs to identify minimum wage violations; such an individualized assessment is improper for collective treatment.

### III. Plaintiff's Motion is Not Supported by Admissible Evidence.

In determining whether individuals are similarly situated, the court "need not accept the plaintiff's allegations as true." *Nehmelman v. Penn Nat'l Gaming, Inc.*, 822 F. Supp. 2d 745, 751 (N.D. Ill. Sept. 29, 2011). Instead, the court evaluates the entire record before it, "including the defendant's oppositional affidavits, to determine whether the plaintiffs are similarly situated to other putative class members." *Rottman v. Old Second Bancorp, Inc.*, 735 F. Supp. 2d 988, 990 (N.D. Ill. 2010) (quoting *Jirak v. Abbott Labs., Inc.*, 566 F. Supp. 2d 845, 848 (N.D. Ill. 2008)).

Plaintiff cannot meet his burden "with vague, uncorroborated, conclusory hearsay." *Boyd v. Alutiiq Glob. Sols., LLC*, No. 11-cv-0753, 2011 U.S. Dist. LEXIS 88656, at *16 (N.D. Ill. Aug. 8, 2011). "Moreover, declarations filed in support of a motion for conditional certification must be based on personal knowledge." *Id.* (assertions in declarations based on statements by other employees were not sufficient to support conditional certification).

Many of Plaintiff's and the Opt-In Declarants' assertions are conclusory or not based on personal knowledge and should be disregarded when considering conditional certification. For example, Plaintiff asserts that employee drivers and OOs use the same policy manual. (Plf. Exh. 4 ("Brant Dec.") ¶ 21. But Plaintiff neither asserts that he has personal knowledge as a former employee driver nor attaches any policy manual at all to his motion, so the Court should not credit this statement.[6] Other assertions not based on personal knowledge include:

---

[6] In fact, employee drivers and OOs are not provided the same manual; OOs receive a "Best Practices Guide," while employees receive a Driver Handbook. L. Bethea Dec. ¶ 28.

- "other owner operators could not work for anyone other than Schneider while under contract with Schneider," *id.* ¶ 19;

- "I understood that the work rules and procedures were the same as Schneider required employee drivers to follow," *id.* ¶ 21;

- "other owner operators were required to follow Schneider's procedures for filling out and filing paperwork, and for staying in touch with the dispatch officer and Schneider's driver manager," *id.* ¶ 23;

- "Schneider limited . . . other owner operator drivers to posted speed limits or [sic] 70 mph," *id.* ¶ 25;

- "I know drivers who received calls from Schneider telling them that they would be terminated if they sped again," *id.* ¶ 26;

- "Schneider required . .. other owner operators to get a permission slip from Schneider to have guests or pets in the truck," *id.* ¶ 30.

Plaintiff offers no basis for such knowledge of the other OOs' experiences – and, as described in detail below, they are not common throughout the collective in any event.

## IV. __The Proposed Collective Is Not Similarly-Situated With Respect to Employment Status Under the Economic Realities Test.__

It is not enough for Plaintiff to establish some evidence that he may have been misclassified. He must demonstrate that all class members were misclassified based on common evidence. *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 816 (7th Cir. 2012) ("[P]laintiffs had to show that it was possible to use common evidence" to vindicate their antitrust claims). Plaintiff must submit evidence "beyond allegations" that class members were "subjected to a common policy." *Williams v. Angie's List, Inc.*, 223 F. Supp. 3d 779, 783 (S.D. Ind. 2016).

Here, Plaintiff has not shown that he is similarly-situated to a massive collective of drivers in ways that matter to the fact-intensive economic realities test. Plaintiff and the collective are not similar in terms of 1) the nature and degree of alleged control of the drivers; 2) opportunity for profit or loss depending upon managerial skill; 3) investment in equipment or materials; 4) whether the service requires special skill; and, 5) the permanency and duration of the relationship.

Furthermore, Plaintiff cannot demonstrate minimum wage violations on a collective basis. Rather, finding such violations requires a driver-by-driver, week-by-week audit.

To determine whether an individual is misclassified under the FLSA, courts within the Seventh Circuit apply a six-factor "economic realities" test. *Sec'y of Labor, United States Dep't of Labor v. Lauritzen*, 835 F.2d 1529, 1534 (7th Cir. 1987). Under this test, "employees are those who as a matter of economic reality are dependent upon the business to which they render service." *Id*. In applying this test, courts do "not look to one isolated factor, but to the totality of the individual's work activity." *Id*. The six factors are:

> 1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;
>
> 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
>
> 3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;
>
> 4) whether the service rendered requires a special skill;
>
> 5) the degree of permanency and duration of the working relationship;
>
> 6) the extent to which the service rendered is an integral part of the alleged employer's business. *Id.* at 1535.

Plaintiff cannot show he is similarly situated to the collective with respect to employment status because whether any OO is an employee necessarily requires an individualized inquiry, based upon the totality of the circumstances, into each individual's relationship with Schneider. *In re FedEx Ground Package Sys., Inc., Emp't Practices Litig.*, 662 F. Supp. 2d 1069, 1083 (N.D. Ind. 2009) (denying motion for collective action because, among other reasons, misclassification determination required individualized inquiry). In *FedEx*, the Court denied the plaintiff truck drivers' motion to certify a collective action on their misclassification claim, because the court would have had to "take into consideration the actual history of the parties' relationship,

necessitating an individualized examination of the multiple factors relating to each drivers' employment." *Id*. Therefore, the plaintiffs failed to demonstrate they were substantially similar to the proposed class "[b]ecause the evidence pertaining to such factors varie[d] in material respects throughout the proposed class." *Id*.; *see also Pfaahler v. Consultants for Architects, Inc*., Cause No. 99 C 6700, 200 U.S. Dist. LEXIS 1772, at *4-9 (N.D. Ill. Feb. 8, 2000) (denying motion for collective action in misclassification case due to individualized inquiry).

The fact that Plaintiff and members of the purported collective signed the same or similar OOOAs is not a sufficient basis for certification. *Scott v. NOW Courier, Inc.*, No. 1:10-cv-971, 2012 U.S. Dist. LEXIS 43710, at *27-28 (S.D. Ind. Mar. 29, 2012) ("Plaintiffs cite the fact that all NOW drivers execute virtually identical agreements containing common terms relating to their job responsibilities and compensation. . . . they attempt to substantiate this claim by characterizing the common, shared job responsibility among all drivers as providing courier services to Defendant's customers on behalf of NOW. That is plainly true, but it hardly describes the varied ways in which NOW contracts both with its clients and its drivers to deliver those services.")

In fact, Plaintiff's argument that the collective is similarly-situated relies heavily, if not exclusively, on his assertion that all drivers signed the same OOOA. Pltf's Mem., Dkt. 105, at 3-4. Plaintiff urges that because the form OOOAs were "materially the same for all Drivers," and "set forth terms and conditions of work applicable" to all the drivers, ultimately the OOOA created an employee relationship with all of the drivers. *Id.* at 4 (alleging that the "OA, as interpreted and implemented by Schneider, created an employer/employee relationship"); *id.* at 8 (arguing that because all drivers signed "materially similar operating agreements," that "all Drivers operated under materially identical terms and conditions of work").

Plaintiff's argument fails. The Seventh Circuit's ruling in this case made clear that it is *not* the OOOAs, but individualized "economic realities," that control employee status. In fact, the Seventh Circuit stated that "if we looked only at the face of Brant's contracts with Schneider, we would agree with the district court that Brant could not be deemed an employee." 43 F.4th 656, 665 (7th Cir. 2022). Rather than do that, the Seventh Circuit repeatedly credited Plaintiff's allegations that the OOOA did not reflect reality. Plaintiff alleged that his contractual rights to hire help, dictate his routes, choose his loads, drive for other carriers, and invest in his driving business outside of SNC's credit were all things he personally could not do in practice. *Id.* at 668-69. Plaintiff's arguments allowed him to survive a motion to dismiss, *id.*, but they also defeated his argument that all OOs are similarly-situated. SNC has put forth evidence from drivers who swear that they *did* actually dictate their own routes, choose their own loads, choose their own schedules, and receive real opportunity for profit and economic freedom. These drivers' economic realities have nothing in common with Plaintiff's. Plaintiff cannot now turn back to the OOOAs to claim similarity with these drivers who achieved what was impossible in his economic reality.

## A. Nature and degree of control

The proposed class members differ in their relationship to Schneider and the degree of alleged control, which makes class certification inappropriate. Plaintiff Brant claims that Schneider controlled him because it controlled his truck by virtue of the terms of his truck Lease. Brant Dec. ¶¶ 31, 37, 48, 50. But this is not the case throughout the collective, or even among the Opt-In Declarants. David Collins paid off his Lease, then took his truck to another carrier. Jeremy Baldwin took his truck to a different carrier while still under lease from SFI. Other members of the proposed collective were free to select loads, decide how to deliver the loads, decide when and when not to drive, and generally free to decide how to operate their businesses in ways dramatically different from the reported experience of Plaintiff Brant. *See, e.g.*, Wetenkamp Dec. ¶¶ 17-18, 21-

22 (OO has discretion in loads to select and how to deliver them; has discretion to take time off and took 3 months off to spend time with wife when she had health issues); Blackburn Dec. ¶¶ 21-24, 27 (OO prefers to select loads that take him from Texas to Pennsylvania, then to Florida and back to Texas); Lafon Bethea Dec. ¶¶ 22-23, 31-33, 37 (OO chooses lightweight freight primarily in the Midwest and Southeast); Sledge Dec. ¶¶ 15, 21, 22 (OO pre-assigned himself loads to drive from Georgia to Pennsylvania, to upstate New York or Maine, then back to Pennsylvania, and back to Georgia); Adams Dec. ¶¶ 16-19, 32-33 (OO selects loads based on pickup and destination, weight and type of materials; has never been disciplined and is not in regular contact with SNC dispatchers; pre-assigns himself loads to keep schedule consistent; declines loads, and potential profits, in order to be home with family).

Furthermore, OOs had the freedom to drive for other motor carriers and were not exclusively required to drive for Schneider. Plaintiff contends that he was not permitted to drive for other carriers. Brant Dec. ¶ 39. Other collective members had different experiences, and were aware they could drive for other carriers. *See, e.g.*, Adams Dec. ¶ 25; Sledge Dec. ¶ 28; Wettenkamp Dec. ¶ 23; Blackburn Dec. ¶ 32; Lafon Bethea Dec. ¶ 29.

OOs can drive for other carriers at any time by submitting a "trip lease." To comply with FMCSA regulations that require some limited oversight of OO operations that drive under Schneider's operation authority, while permitting owner-operators to deliver for other carriers, SNC permits owner-operators to request a trip lease in which the owner-operator performs transportation services for another carrier. L. Bethea Dec. ¶ 41. SNC regularly approves requests for trip leases. *Id.* Neither Plaintiff nor any of the Opt-In Declarants state that they ever actually requested a trip lease. The trip lease option demonstrates that OOs are not exclusively required to

drive for Schneider while under an OOOA with Schneider (as does the fact that Opt-In Plaintiffs including Opt-In Declarants took their SFI-leased trucks to drive for SNC competitors).

While Schneider collects certain operational data for safety purposes, collection of data does not amount to an exercise, or even a right, of control. Plaintiff cites OOOA provisions permitting SNC to view details of OOs' driving as evidence of control. Brant Dec. ¶¶ 25, 26. The OOOA permits SNC to collect and view certain driver data, including speed and hard braking, in order that SNC, as the FMCSA operating authority, can ensure that it maintains relationships with safe drivers and revokes its authority from, or non-renews, unsafe drivers. L. Bethea Dec. ¶ 29. This right is inherent in SNC's obligation to issue its operating authority responsibly. Other declarants testify that SNC has done nothing with their driver data collected. *See, e.g.*, Blackburn Dec. ¶ 25 (SNC has not discussed collected data with OO); Lafon Bethea Dec. ¶ 26 (SNC has not discussed collected data with OO); Sledge Dec. ¶ 20 (SNC has not discussed collected data with OO); Adams Dec. ¶ 20 (SNC has not discussed collected data with OO). As apparent from the above examples, the nature and degree of control to which each member of the proposed collective was subject varies widely, based on the evidence before the Court, and Plaintiff has failed to make even a modest factual showing that he is similarly-situated to the collective he seeks to represent.

### B.     Opportunity for profit and loss

OOs vary dramatically in their revenue intake, expenses, and profit, which directly relates to their skills at running a business. Plaintiff contends that he lacked opportunity for profit. *See generally* Brant Dec. Of course, a true entrepreneurial opportunity presents an opportunity for profit <u>or loss</u>. Other OOs describe using business judgment to earn good profits and comfortable livings. *See* Wettenkamp Dec. ¶ 27 (business strategy is to look at total revenue per load versus average mileage revenue); ¶ 35 (takes home more profit than he did as an employee driver); Sledge Dec. ¶ 16 (most profitable freight is in the Northeast, but can still find freight to get home to

Georgia), ¶ 44 (lives comfortably as an owner-operator); ¶ 34 (succeeds by adapting his business to changing market); Blackburn Dec. ¶ 35 (affects profitability through route selection, speed, fuel purchases, and regular maintenance), ¶ 46 (pays for accounting service), ¶ 51 (earned $80-85,000 profit on $145,000 gross revenue). And the opportunities for profit varied not only by OO, but also by the OO's chosen geography and business unit. L. Bethea Dec. ¶ 23.

Some collective members enjoyed the opportunity for significant profit. The collective is not similarly-situated because every individual OO must be analyzed for opportunity for profit or loss, based on business line, geography, available loads, and actual earnings. These opportunities are not subject to collective proof, and Plaintiff has failed to make a factual showing that he is similarly-situated to the collective he seeks to represent.

### C.    Investment in equipment or materials.

OOs invest very differently into their businesses. OOs' primary business investment is their truck. Plaintiff, the six Opt-In Declarants, and every member of the proposed collective invested very differently in their trucks. Some OOs put no down payment on their truck, make few lease payments, and then surrender their truck. Others put significant down payments—up to $14,000. *See* L. Bethea Dec. Exh. C (David Collins ($3,000 down payment); Jocelyn Tate ($1,900 down payment); B. Minor ($1,400 down payment)). Their monthly Lease payments range from Others trade in their trucks regularly for newer models to reduce maintenance costs. Adams Dec. ¶ 10. Some, such as David Collins and 30% of the 114 Opt-In Plaintiffs, pay off their truck within several years and own it outright. L. Bethea Dec. ¶ 47 & Exh. C. Plaintiff's proposed collective encompasses these differently-situated OOs.

In addition, members of the proposed collective invest differently in tools for their business other than their trucks. *See, e.g.*, Sledge Dec. ¶ 38 (OO invests in accounting services); Wettenkamp Dec. ¶ 36 (same); Blackburn Dec. ¶¶ 18, 19 (OO sets aside weekly amounts into

maintenance fund and time-off fund; invested in smart phone, tow weather equipment, fifth wheel puller, tools); Lafon Bethea Dec. ¶ 20 (OO invested in laptop computer, business formation, and phone). And collective members invest in repairs and maintenance at facilities of their choosing. *See, e.g.*, Newell Dec. ¶ 32; Williams Dec. ¶¶ 46, 47; Wetenkamp Dec. ¶ 24; Blackburn Dec. ¶ 48; Sledge Dec. ¶ 40; Adams Dec. ¶ 41.

Creation of a business entity is investment in a business. *See Christianson v. Newpark Drilling Fluids, LLC*, No. H-14-3235, 2015 U.S. Dist. LEXIS 34088 (S.D. Tex. Mar. 19, 2015) (denying conditional certification when some workers contracted through limited liability companies); *Clay v. New Tech Glob. Ventures, LLC*, No. 16-296-JWD-CBW, 2019 U.S. Dist. LEXIS 34306, at *38 (W.D. La. Mar. 4, 2019) ("The plaintiffs' varying revenues, investments, and different decisions with respect to whether to establish independent business entities (and engage in outside work) could lead to disparate results regarding each plaintiff's level of economic dependence."); *Spellman v. Am. Eagle Express, Inc.*, No. 10-1764, 2013 U.S. Dist. LEXIS 35032, at *15 (E.D. Pa. Mar. 14, 2013) (formation of separate business entities was the "kind of entrepreneurial conduct [which] strongly suggests an independent contractor relationship, while the absence of such activity is indicative of employment").

OOs differ in their business organization structure, or whether they formed a business entity at all. Creation of a limited liability entity is a financial commitment that Plaintiff did not make. But 75% of SNC OOs do make this investment. L. Bethea Dec. ¶ 24. Plaintiff is not even similarly-situated to three of his own six Opt-In Declarants in this regard because Mr. Minor, Ms. Tate, and Mr. Campbell operated through LLCs while Plaintiff did not.

Plaintiff has failed to make a factual showing that he is similarly-situated to the members of the proposed collective with respect to the investment he made in equipment or the type of entity

under which he operated. *See Blair v. TransAm Trucking, Inc.*, 309 F.Supp.3d 977, 1007 (D. Kan. 2018) (stating that due to "differing levels of investments into [proposed plaintiffs'] businesses, it would not be possible to perform a uniform analysis on the entire class."); *Christianson*, 2015 U.S. Dist. LEXIS 34088, at *9 (investments vary significantly where some workers contracted through LLCs and others as individuals, and some used their own office equipment while others did not).

### D.  Skill required

OOs vary in the skills and business acumen required by their business. The "skill required" factor considers "whether [OOs'] profits increased because of the initiative, judgment, or foresight of the typical independent contractor, or whether the work was more like piecework." *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 809 (6th Cir. 2015).   Driving a truck itself is not the only skill relevant to economic reality.   "Plaintiffs clearly need to possess business acumen, diligence, and managerial skills as they are much more like businesspeople rather than merely drivers, even though they may drive the trucks themselves. They control what hauls they accept. They control what routes they take. They control when they work. The Court finds this factor weighs in favor of Defendants." *Derolf v. Risinger Bros. Transfer*, 259 F. Supp. 3d 876, 883 (C.D. Ill. 2017).

The collective members vary in the business acumen they possess and/or exercise.  Plaintiff Brant claims to have exercised none.  *See generally* Brant Dec.  But others demonstrably did.  *See, e.g.*, Wetenkamp Dec. ¶¶ 7, 25, 27 (negotiated terms with Schneider, makes decisions about strategy, loads and routes that affect profitability); Blackburn Dec. ¶¶ 35, 37, 40, 51, 52  (selects loads in a manner that affects profitability, including by avoiding gaps in driving schedule, negotiates to take loads that are not on the Choice Portal, operates business that generates $80,000-85,000 profit on $145,000 in annual gross revenue); Lafon Bethea Dec. ¶¶ 31, 33, 36 (manages profitability through load selection and choosing routes, timing, speed, and where to purchase fuel;

operates strategically to generate $2,200 weekly profit on $5,000 revenue). And the skill required varies depending on whether an OO contracts with SNC or SNBC. L. Bethea Dec. ¶¶ 17-19.

As Plaintiff claims to have exercised no skills other than driving a truck, Plaintiff is not similarly-situated to these OOs who demonstrate tremendous and varied business acumen.

### E.     Permanency/duration

Neither are the proposed class members similarly-situated in terms of the duration of their relationship with Schneider. Plaintiff Brant, the Opt-In Declarants, the Opt-In Plaintiffs, and the collective as a whole vary wildly in terms of duration of relationship. Plaintiff Brant worked for Schneider for nine months; Opt-In Declarant David Collins for five and a half years. Lafon Bethea was an OO for Schneider for 17 years, left, and came back. The Opt-In Plaintiffs range in tenure with SNC from two months to more than 16 years. L. Bethea Dec. Exh. C.

The OOOAs that Plaintiff and other OOs sign are non-renewable and expire at the end of each calendar year so they are not intended to establish an indefinite or permanent relationship. At the end of each calendar year, some OOs choose not to renew their relationship with SNC and may take their SFI-leased equipment to drive for another carrier. Likewise, each year SNC decides not to renew its relationship with a (typically limited) number of OOs. L. Bethea Dec. ¶ 29.

Plaintiff's proposed collective is comprised of individuals who differ in significant ways as to five of six elements of the economic reality test.[7] These differences matter. Courts deny conditional certification of such diverse collectives under the economic realities test. *In re FedEx Ground Package System, Inc*., 662 F. Supp. 2d at 1083 ("Because the evidence pertaining to such factors varies in material respects throughout the proposed class, there is a lack of substantial similarity among the putative class members sufficient to justify treatment as a collective action.");

---

[7] Schneider does not dispute that Plaintiff and the collective are similarly-situated with respect to whether their services are an integral part of Schneider's business.

*Pfaahler v. Consultants for Architects*, No. 99 C 6700, 2000 U.S. Dist. LEXIS 1772, at *8 (N.D. Ill. Feb. 11, 2000) (denying conditional certification in where "the court would be required to make a fact-intensive, individual determination as to the nature of each potential claimant's employment relationship with CFA."). The Court should also do so here.

## V. Plaintiff's Proposed Collective Is Not Similarly-Situated With Respect to Alleged Minimum Wage Violations.

Even if Plaintiff demonstrated he was similarly-situated to the collective for purposes of the economic realities test, this would not be enough to justify conditional certification. Plaintiff's FLSA claim is not merely that he was misclassified, but that he was misclassified <u>and</u> received less than FLSA-mandated minimum wage in some workweeks.[8] Plaintiff fails to present any basis to believe that he is similarly-situated to the collective in terms of alleged failure to receive minimum wage, and any such alleged failure could not be determined on a collective basis.

### A. Plaintiff presents no evidence that any collective member received less than minimum wage.

Plaintiff has not provided specific evidence that the class members are similarly situated in terms of whether they were receiving less than minimum wage. Courts refuse to conditionally certify classes based on vague, conclusory statements. *See, e.g.*, *Vargas v. HEB Grocery Co., LP*, No. SA-12-CV-116-XR, 2012 U.S. Dist. LEXIS 132030, at *13-14 (W.D. Tex. Sep. 17, 2012) ("Plaintiffs only offer conclusory statements that they are aware that other workers were denied minimum wages and/or overtime. This is insufficient."); "Plaintiffs' terminology in asserting that all drivers . . . 'at least on some occasions earned less than minimum wage'. . . is telling in its

---

[8] Plaintiff fails to so much as acknowledge this fact, let alone its fatal implications, in his Motion. The Court must refer back to the First Amended Complaint ¶ 2 ("Plaintiff brings his federal minimum wage claim under the collective action provision of the FLSA as set forth in 29 U.S.C.A. § 216(b) and his state claims and TILA claims as class actions pursuant to Rule 23 of the Federal Rules of Civil Procedure"), to see that Plaintiff's proposed collective action is premised on minimum wage violations. Dkt. No. 63. Plaintiff's proposed Notice also explains that the proposed collective action seeks redress for alleged minimum wage violations.

vagueness and lack of specificity." *Scott v. NOW Courier*, No. 1:10-cv-971, 2012 U.S. Dist. LEXIS 43710, at *31 (S.D. Ind. Mar. 29, 2012); *Pfaahler*, 2000 U.S. Dist. LEXIS 1772, at *2 ("Pfaahler provides no grounds indicating his knowledge of the work other workers performed . . . or the circumstances of potential claimants . . . .").

Anecdotal evidence, such as that provided by Plaintiff, is "insufficient to show that [Schneider] has a common pay policy that allegedly violated the FLSA." *Armstrong v. Wheels Assured Delivery Sys.*, No. 1:15-cv-00354-SEB-MJD, 2016 U.S. Dist. LEXIS 43851, at *17-19 (S.D. Ind. Mar. 30, 2016) (denying certification for violations of the FLSA largely because the drivers were paid per delivery, were subject to different payment calculations, did not drive the same number of miles each day, and did not work the same number of hours each day).

Plaintiff has not provided facts supporting his assertion that the class members are similarly situated on this point. Plaintiff and his declarants allege in conclusory fashion, with no facts, that in some weeks they received negative settlements. *See* Baldwin (2020) Dec. ¶ 18 ("During my time working for Schneider there were many weeks where, despite working long hours, I would receive a negative settlement – that is, I would end my work week owing Schneider money despite the many hours of work I had put in."); Campbell Dec. ¶ 23 (*verbatim*); Rich Dec. ¶ 19 (*verbatim*); Collins ¶ 24 (*verbatim*); Minor Dec. ¶ 18 (*verbatim*); Tate Dec. ¶ 16 (*verbatim*); Brant Dec. ¶ 20 (*verbatim*). They do not allege personal – or any – knowledge that any member of the proposed collective besides themselves received a negative settlement or less than minimum wage.

Plaintiff identifies only one specific instance in which any OO was allegedly paid less than minimum wage: "[b]y way of example only, for the week of May 2, 2019, Plaintiff Brant drove

over 3,000 miles carrying 5 loads for Schneider and received $0.00 as his net settlement." First Am. Compl. ¶ 144 (Dkt. No. 63).[9] This anecdote is not a sufficient basis to certify a collective.

### B. Whether any OO received less than minimum wage requires a highly individualized inquiry inappropriate for collective treatment.

Were the Court to certify Plaintiff's proposed collective, the Court would need to analyze each collective member's payment and hours on a week-by-week basis to assess liability. Therefore, conditional certification is inappropriate. *Blakley v. Celadon Grp., Inc*., No. 1:16-cv-00351-SEB-TAB, 2017 U.S. Dist. LEXIS 215944, at *13-15 (S.D. Ind. Oct. 18, 2017) (conditional certification inappropriate where "the individualized calculation at issue informs the liability determination for violating the FLSA"); *see Armstrong*, No. 1:15-cv-00354-SEB-MJD, 2016 U.S. Dist. LEXIS 43851, at *17-18 (S.D. Ind. Mar. 30, 2016) (denying conditional certification where "resolution of the Drivers' claims will require an individualized and highly fact intensive inquiry both to determine whether any of the drivers were misclassified as independent contractors rather than employees and, if so, as to the wages earned, hours worked, and miles driven by each allegedly misclassified driver to determine whether any violation . . . occurred").

Under the FLSA, an employer does not meet the minimum wage requirement if "the employee 'kicks-back' directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee." 29 C.F.R. § 531.35. "Under the 'free and clear' rule, an employer must pay the minimum wage free and clear of any expenses that primarily benefit the employer." *Jimenez v. GLK Foods LLC*, No. 12-CV-209, 2016 U.S. Dist. LEXIS 69007, at *90 (E.D. Wis. May 23, 2016) (Griesbach, J.). Whether particular expenses may be considered wages requires a "case-by-case analysis." *Hernandez v. JRPAC Inc*.,

---

[9] Strangely, it is not mentioned in Plaintiff's brief or declaration.

No. 14-civ.-4176, 2016 U.S. Dist. LEXIS 75430, at *84 n.25 (S.D.N.Y. June 9, 2016) (citing *Soler v. G. & U., Inc.*, 833 F. 2d. 1104, 1109 (2d Cir. 1987)).

Determining minimum wage violations for any OO demonstrated to be an employee would be an individualized exercise. OOs are paid by the load – not the hour. L. Bethea Dec. ¶¶ 34-35. To determine whether any OO ever received less than minimum wage, the Court would be forced to analyze each driver's weekly settlements and divide the compensation received by the compensable hours worked to determine an hourly wage.

The single violation alleged by Plaintiff illustrates the required inquiry. On his May 2, 2019 settlement, Plaintiff was paid total revenue of $4,927.56. Declaration of Greg Cornelius Dec. Exh. A. His driver logs for April 25-May 1, 2019, reflect that Plaintiff spent roughly 41 hours on-duty or driving, for an hourly rate comfortably over minimum wage on a gross basis. T. Carpenter Dec. Exh. A.

Plaintiff's total deductions equaled his gross revenue, so his net settlement was zero. Cornelius Dec. Exh. A. Plaintiff assumes, apparently, that none of the deductions may be credited to him as wages under the FLSA. Under the standard described above, this assumption is incorrect. For instance, the $2,841.90 in total truck lease payments reflected on Plaintiff's settlement statements created equity in the vehicle and benefited him. To the extent that Plaintiff argues that his truck payments primarily benefitted Schneider, and therefore could not be credited as wages under 29 C.F.R. § 531.35, this analysis would be quite different for David Collins, who paid off his SFI Lease and took his truck to work elsewhere. L. Bethea Dec. ¶ 47. Or Jeremy Baldwin, who took his SFI-leased truck to drive for another carrier. *Id.* ¶ 46. Or the 30% of the Opt-In Plaintiffs who paid off their leases. *Id.* Exh. C. The same is true for other deductions on Plaintiff's May 2, 2019 settlement such as licenses and insurance, and even fuel and tolls, as he might have

been driving his truck for personal reasons. In addition, Plaintiff received a deduction for a $150 advance on his May 2, 2019 settlement. M. Thompson Dec. Exh. A. Advances are requested by the OO. L. Bethea Dec. ¶¶ 33, 37. To determine whether this deduction should be credited as wages requires analyzing the circumstances of the advance and repayment.

Determining "hours worked" for minimum wage purposes would present more individualized issues. OOs log hours driving, not driving/on-duty, and off duty for DOT regulation purposes, not for FLSA purposes. L. Bethea Dec. ¶ 35. It cannot be assumed that every hour spent driving or on-duty/not driving represents compensable time under the FLSA. An individualized inquiry into the hours spent in each settlement period, for each OO, would be required.

In *Espenscheid v. DirectSat USA, LLC*, the Seventh Circuit affirmed decertification where calculating damages would, "it turns out, require 2341 separate evidentiary hearings, which might swamp the Western District of Wisconsin with its two district judges." 705 F.3d 770, 773 (7th Cir. 2013). This was so because the members of the collective were paid on a piece-rate basis and did not work regular hours. *Id.* In the end, the court declined certification, in part because there was no "genuinely representative evidence." *Id.* at 775.

The same conclusion obtains here. Whether or not each deduction could be credited towards the FLSA minimum wage requires an individualized inquiry. The Court would have to engage in this analysis for each and every workweek, for each and every OO.

This is not merely a question of damages – it is a matter of establishing <u>liability</u> to each OO under Plaintiff's FLSA minimum wage claim. Because the members of the proposed collective are not subject to a common pay policy, conditional certification is inappropriate. *Blakley*, 2017 U.S. Dist. LEXIS 215944, at *13-15; *see also Fuller v. Jumpstar Enters., LLC*, No. H-20-1027, 2021 U.S. Dist. LEXIS 232709, at *13-14 (S.D. Tex. Dec. 6, 2021) (denying

31

conditional certification where drivers worked different hours and earned different weekly amounts throughout the collective period); *Cotton-Thomas v. Volvo Grp. N. Am., LLC*, 20-cv-113, 2021 U.S. Dist. LEXIS 99752, at *2 (N.D. Miss. May 25, 2021) (denying conditional certification where "each [collective-action] member would be required to testify as to their individual circumstances, including how often they worked"); *Armstrong*, 2016 U.S. Dist. LEXIS 43851, at *17 ("Ms. Armstrong's anecdotal evidence relating to only her own alleged underpayment is wholly insufficient to show that Employers had a common pay policy that allegedly violated the FLSA."); *Flores v. Lifeway Foods, Inc.*, 289 F. Supp. 2d 1042, 1046 (N.D. Ill. 2003) ("It is the opinion of the Court that a demonstration of [the defendant's] payment practice concerning two out of fifty employees (four percent of Defendant's workforce) does not rise to the level of a common policy or plan by [the defendant] that violated the FLSA.").""

## VI.    Plaintiff's Cited Cases Are Inapposite.

Plaintiff cites a variety of out-of-circuit cases in which Courts certified FLSA collectives that are distinguishable. In *Canava v. Rail Delivery Service*, a district court in California found that Plaintiff's allegation that all collective member signed the same or similar agreements was a sufficient basis for conditional certification. No. 19-401, 2020 U.S. Dist. LEXIS 87217, at *21 (C.D. Cal. Feb. 27, 2020). The court did not address the logistics of locating minimum wage violations for every collective member, or the size of the collective. Similarly, courts in *Carter v. XPO Last Mile, Inc.*, No. 16-cv-01231, 2016 U.S. Dist. LEXIS 137176, at *10, 13 (N.D. Cal. Oct. 3, 2016), and *Flores v. Velocity Express, Inc.*, No. 12-cv-05790, 2013 U.S. Dist. LEXIS 77821, at *21 (N.D. Cal. June 3, 2013), declined to consider non-California authorities, including authorities from within this Circuit, declined to consider defendant's declarations, and simply credited plaintiffs' allegations that all collective members signed the same or similar agreements. These cases are not persuasive nor instructive given the contrary authorities in this Circuit.

In *Scott v. Bimbo Bakeries, Inc.*, the Court certified a collective in light of evidence that members regularly worked far in excess of 40 hours per week; no such evidence has been presented here. No. 10-3154, 2012 U.S. Dist. LEXIS 26106, at *11 (E.D. Pa. Feb. 29, 2012). In *Collinge v. Intelliquick Delivery, Inc.*, the Court declined to decertify a collective where plaintiffs presented evidence that delivery drivers were subject to a "series of 'uniform standard operating procedures' that tell them what they are required to do, within which 'time frame' they must do it, and which equipment they must use;" no such evidence has been presented here and in fact the evidence presented indicates that OOs have substantial independence in how they haul loads. No. 2:12-cv-00824, 2015 U.S. Dist. LEXIS 35858, at *8 (D. Ariz. Mar. 23, 2015). *Villalpando v. Exel Direct Inc.* involved the Court's refusal to decertify a Rule 23 class action involving state law wage and hour claims and has nothing to do with the present motion. No. 12-cv-04137, 2016 U.S. Dist. LEXIS 53773, at *4 (N.D. Cal. Apr. 21, 2016).

Plaintiff also cites *Mitchell v. Trilliant Food & Nutrition, LLC*, but *Mitchell* is not instructive here. No. 19-C-147, 2020 U.S. Dist. LEXIS 42927 (E.D. Wis. Mar. 12, 2020). In *Mitchell*, this Court certified a collective of production employees who worked together on operating lines that were "integrated, so all bagging employees must take their meal breaks simultaneously," were denied a full 30-minute meal break. *Id.* at *6-8. The Court found that "production employees were required to uniformly leave their work areas, clock out on the electronic timekeeping system, and clock back in and physically return to their work areas within thirty consecutive minutes from the time they clocked out." *Id.* at *7-8. This Court conditionally certified the collective because "record evidence suggests that all production employees were subject to a common policy." *Id.* at *9. *Mitchell* has nothing to say about whether a nationwide

33

class of thousands of over-the-road drivers who chose their own freight, routes, and hours and were paid by the load can pursue minimum wage claims collectively.

## VII.    Plaintiff's Proposed Notice Is Improper

Should the Court decide that notice should issue, Plaintiff's proposed Notice must be revised.  When exercising discretion to facilitate notice to potential plaintiffs in FLSA collective action, "'courts must be scrupulous to respect judicial neutrality' and to avoid 'even the appearance of judicial endorsement of the merits of the action.'"  *Mitchell*, 2020 U.S. Dist. LEXIS 42927, at *10 (quoting *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 169 (1989)).  When approving such judicial notice, the Court must ensure that there is no "apparent judicial sponsorship of the notice." *See Woods v. New York Life Ins. Co.*, 686 F.2d 578, 581 (7th Cir. 1982).

### A.    Requiring Schneider to deliver notice via its Platform Science system is unnecessary and disruptive.

The Court should not order notice to issue via Schneider's Platform Science system.[10] Delivering notice by first-class mail and electronic mail is more than sufficient to provide potential opt-in plaintiffs with information and an opportunity to join this action.[11]  Plaintiff's own cases support this conclusion.  *See* Dkt. 105 at p. 13 (citing several cases involving truck driver plaintiffs where court only required notice by mail and e-mail).  And in one of Plaintiff's cases, the court outright rejected the request to deliver notice via the trucking company's Qualcomm system.  *See Elmy v. W. Express, Inc.*, No. 3:17-cv-01199, 2019 U.S. Dist. LEXIS 212412, at *7 (M.D. Tenn. Dec. 10, 2019) ("[T]he Court is unconvinced that the third method of sending an advisory text via Qualcomm is necessary in this case."); s*ee also Davis v. Colonial Freight Sys.*, No. 3:16-CV-674-TRM-HBG, 2018 U.S. Dist. LEXIS 76225, at *12 (E.D. Tenn. Apr. 30, 2018) ("[T]he Court

---

[10] Plaintiff refers to a "Qualcomm" system.  SNC used to use a Qualcomm onboard messaging system, but no longer does.  L. Bethea Dec. ¶ 42.  This brief refers to the onboard messaging system as the Platform Science system.
[11] Indeed, SNC distributes OOOAs for review and signature via e-mail.  L. Bethea Dec. ¶ 8.

declines to order [defendant] to send messages via its Qualcomm system and . . . finds that reminder postcards and emails are not necessary . . . .").[12]

Requiring SNC to deliver notice via its Platform Science system is disruptive to SNC's operations because SNC has no mechanism to limit the message to only OOs who fall with the proposed collective, i.e., those who lease from SFI. Rather, any mass message sent via Platform Science would necessarily be sent to drivers who are not part of the collective, such as OOs who never leased from SFI. *See* L. Betha Dec. ¶ 42. This renders the Platform Science system both inefficient and ineffective for delivering notice, and potentially damaging to SNC's business. Requiring SNC to send the notice to its entire fleet, which would include thousands of drivers who cannot be part of this action, would result in confusion, create disruption to SNC's operations, and "unnecessarily [waste] the time and resources of the parties through over-broad notice." *Wynn v. Express, LLC*, No. 11 C 4588, 2012 U.S. Dist. LEXIS 34023, at *9 (N.D. Ill. Mar. 14, 2012). The Court should reject Plaintiff's request to deliver the notice via the Platform Science system.

### B. A reminder is unnecessary.

The Court should not issue a reminder inviting individuals to join this lawsuit. Plaintiff acknowledges that this Court has ruled that a reminder notice is unnecessary. *Rego v. Liberty Mut. Managed Care LLC,* No. 17-C-66, 2017 U.S. Dist. LEXIS 225448, at *4-6 (E.D. Wis. Aug. 23, 2017). In another case, this Court concluded that "a reminder is unnecessary and may even be misinterpreted as judicial encouragement to join the lawsuit." *Schroeder v. Humana Inc*., No. 12-C-0137, 2012 U.S. Dist. LEXIS 168759, at *28 (E.D. Wis. Nov. 27, 2012); *see also Witteman v.*

---

[12] Plaintiff cites to *Doe 1 v. Swift Transp. Co.,* No. 2:10-cv-00899 JWS, 2017 U.S. Dist. LEXIS 26506, at *12 (D. Ariz. Feb. 24, 2017) to support requiring notice to be delivered via Qualcomm. *Swift Transportatio*n is easily distinguishable because the court was not ruling on the method for delivering notice to potential opt-ins after conditional certification; rather, the court was requiring the defendant to deliver a *curative* notice after concluding that the defendant engaged in misleading and coercive communications to putative class members during the pendency of the litigation and prior to class certification.

*Wis. Bell, Inc.,* No. 09-cv-440-vis 1, 2010 U.S. Dist. LEXIS 8845, at *10 (W.D. Wis. Feb. 2, 2010) ("The purpose of notice is simply to inform potential class members of their rights. Once they receive that information, it is their responsibility to act as they see fit.").

While "a second notice might increase the number of opt-ins, as might a third, fourth or fifth, all in furtherance of the remedial goals of the FLSA, Plaintiff fails to present 'any evidence that a single notice is inadequate to accomplish the purpose intended.'" *Rego*, 2017 U.S. Dist. LEXIS 225448, at *5. The Court should reject Plaintiff's request that Schneider deliver a reminder to potential opt-ins who fail to respond 60 days after the issuance of the original notice.

**C.    Plaintiff's request for a 120-day opt-in period is unnecessary and unreasonable.**

The Court should reject Plaintiff's proposed 120-day opt-in period. Plaintiff argues that OOs are away from home for extended periods and "may not receive notice in a timely fashion," but notice via electronic mail sufficiently addresses any potential delays in regular mail. Plaintiff claims that "collective actions involving truck drivers routinely grant opt-in periods ranging from 90 to 150 days," but most of Plaintiff's own cases concluded that 90 days was more than sufficient.[13] In *Huddleston*, the court expressly rejected plaintiff's request for a 120-day period in favor of a 90-day period. *See* 2018 U.S. Dist. LEXIS 73149, at *7-11. Plaintiff miscites *Brown v. Phenix Transp. W. Inc.*, No. 3:13-cv-781-WHB-RHW, 2016 U.S. Dist. LEXIS 90113, at 12-14 (S.D. Miss. Mar. 31, 2016); the plaintiff in that case only requested a 90-day opt-in period, and court merely required the plaintiff's counsel to *file* all opt-in consent forms within 150 days *of the certification ruling. See id.* at *15 ("Plaintiffs also request . . . that the opt-in period last for ninety-

---

[13] *See* Dkt. 105 at p. 12 (citing *Huddleston v. John Christner Trucking*, LLC, No. 17-CV-549-GKF-FHM, 2018 U.S. Dist. LEXIS 73149, at *7-11 (N.D. Okla. May 1, 2018) (90 days); *Gatdula v. Schneider Int'l, Inc.*, 2012 WL 12884919, at *7 (C.D. Cal. Aug 21, 2012) (90-days); *Mowdy v. Beneto Bulk Transp.*, No. C 06-05682 MHP, 2008 U.S. Dist. LEXIS 26233, at *35-38 (N.D. Cal. Mar. 31, 2008) (90 days).

days."). The Court should order an opt-in period of, at most, 90 days for the insurance of the notice.

### D. The language of Plaintiff's Notice should be revised to ensure the appearance of judicial neutrality.

Should the Court decide that notice is appropriate, Plaintiff's proposed notice must be revised in order to ensure that it is accurate and avoids any implication of judicial approval of the merits of the action. First, the title needs to be revised to accurately reflect that this is an misclassification lawsuit, and not merely a lawsuit for "unpaid wages." Second, the italicized language directly below the title should be removed—in particular, the proposed language of "*A Federal Court has authorized this Notice*" unnecessarily creates "the appearance of judicial endorsement of the merits of the action.'" Indeed, this language reads as though the Court is inviting people to join the lawsuit—an impression expressly forbidden by the Seventh Circuit. *Woods v. New York Life Ins. Co.*, 686 F.2d 578, 582 (7th Cir. 1982) ("[T]he power to authorize the sending of notice does not contain, as a matter of logic or good sense, the further power to issue a judicial invitation to join a lawsuit."). Instead, the notice should simply include the full case caption. *See Jirak v. Abbot Labs., Inc.*, 566 F. Supp. 2d 845, 851 (N.D. Ill. 2008).

Moreover, the notice should include language that the opt-ins may have to provide information, sit for depositions, or testify in court. It is well-established that notices must be accurate and informative. Here, opt-in plaintiffs may be called on to testify or provide responses to written discovery. It is appropriate to inform them of that obligation. To that end, Schneider suggests the following language which has been approved by district courts in this Circuit: "While the suit is proceeding, you may be required to provide information, sit for depositions, and testify in Court." *See Russell v. Illinois Bell Telephone Co.*, 575 F. Supp. 2d 930, 939 (N.D. Ill. 2008); *see also Witteman v. Wis. Bell, Inc.*, No. 09-cv-440-vis 1, 2010 U.S. Dist. LEXIS 8845, at *9 (W.D.

*Wis. Feb. 2, 2010)*("Plaintiffs agree to add the following sentence under the heading 'Effect of Joining or Not Joining this Lawsuit': 'If you join the lawsuit, you may be required to respond to written questions, sit for a deposition and testify in court.'").

### E. The Court Should Not Issue Notice to Nearly a Decade's Worth of Former OOs.

Plaintiff's request to issue notice to all drivers who signed an OOOA on or after December 2013 is over-broad and must be rejected. The proposed collective would include thousands of drivers who have only untimely claims because their OOOAs with SNC or SNBC terminated outside the three-year statute of limitations for willful FLSA violations.[14]

Plaintiff attempts to shoehorn the drivers with only untimely claims into the proposed collective by arguing that such drivers "may have an equitable estoppel or equitable tolling defense" that would enable them to assert otherwise untimely claims. Dkt. 105 at pp. 15-16. However, Plaintiff would not be similarly situated to those drivers with only untimely claims because Plaintiff's own FLSA claims do not require establishing an equitable estoppel or equitable tolling defense, thus rendering him to be an inadequate representative of those drivers with only untimely claims because their respective incentives would not be aligned in this litigation. *See Mullins v. Premier Nutrition Corp.*, 2019 U.S. Dist. LEXIS 229365, *7 (N.D. Cal. Dec. 17, 2019) ("[S]tatute of limitations and tolling are likely to become a 'major focus' in this case. Named plaintiffs might have the perverse incentive not to litigate the issue vigorously because it is of no consequence to their own claims—that is, a conflict of interest may arise.").

---

[14] Schneider agreed to toll the statute of limitations from December 11, 2020, until after either final dismissal or resolution of the then-pending conditional certification motion. Plf. Exh. 1E (Mar. 3, 2021 email). The Court denied the original Motion for Conditional Certification as moot on May 20, 2021. Dkt. # 83. Based upon the Court's ruling, Schneider believes that the statute of limitations resumed running on May 20, 2021 and continued running through Plaintiff's Rule 23(f) appeal to the Seventh Circuit.

Moreover, both defenses would require the Court to conduct individualized inquiries for every opt-in plaintiff with untimely claims to determine whether the asserted defenses are applicable with respect to each opt-in plaintiff based on their individualized circumstances. To establish equitable tolling, each opt-in plaintiff would need to prove that "he has been pursuing his rights diligently," which is an inherently individualized assessment. *Knauf Insulation, Inc. v. S. Brands, Inc.*, 820 F.3d 904, 908 (7th Cir. 2016). Similarly, to establish equitable estoppel, each opt-in plaintiff would need individually prove their "actual and reasonable reliance on the defendant's conduct or representations." *Mull v. ARCO Durethene Plastics, Inc.*, 784 F.2d 284, 292 (7th Cir. 1986). Requiring such individualized assessments renders the proposed collective inherently unmanageable because there is no common proof sufficient to establish the defense of equitable tolling or equitable estoppel for all drivers with only untimely FLSA claims. This defeats the purpose of collective certification and demonstrates why those drivers with untimely claims should not be included in any proposed collective.[15] *See Henson v. Fid. Nat. Fin. Inc.*, 300 F.R.D. 413, 420–21 (C.D. Cal. 2014) (rejecting plaintiff's proposed class for including untimely claims because "exceptions to the statute of limitations, such as the discovery rule, equitable tolling, and equitable estoppel . . .are by their very nature fact-intensive and highly individualized"); *Minter v. Wells Fargo Bank, N.A.*, 675 F. Supp. 2d 591, 595 (D. Md. 2009) (noting that "the Fourth Circuit routinely denies equitable tolling in pre-certification class actions where determination of most claims would turn on facts peculiar to the individual claims").

Lastly, Plaintiff's allegations that certain provisions in the OOOAs were "coercive" and "prevented Drivers from asserting their rights" is legally insufficient to establish the defense of

---

[15] One district court within the Seventh Circuit even held that it lacked standing to rule on whether equitable tolling could be applicable for potential plaintiffs who had not yet opted-in, reasoning that "Plaintiffs' precertification request for equitable tolling of the potential opt-in class members' FLSA claims implicates too many contingencies to be ripe." *Davis v. Vanguard Home Care, LLC*, 2016 U.S. Dist. LEXIS 167098, *6 (N.D. Ill. Dec. 5, 2016).

equitable estoppel. In the Seventh Circuit, "[e]quitable estoppel presupposes efforts by the defendant, above and beyond the wrongdoing upon which the plaintiff's claim is founded, to prevent, **by fraud or deception**, the plaintiff from suing in time." *Rosado v. Gonzalez*, 832 F.3d 714, 716 (7th Cir. 2016) (internal quotation marks omitted) (emph. added). Here, there is no allegation of fraud or deception against Schneider. The sole basis for Plaintiff's allegation of "coercive" conduct is premised on the same "wrongdoing upon which the plaintiff's claim is founded"—i.e. that Schneider purportedly misclassified its drivers as independent contractors and entered into contractual provisions to reinforce that classification. *Id.* There is no plausible claim that Schneider's actions actually **prevented** any drivers from pursuing their claims on a timely basis. The mere fact that drivers seeking to challenge their classification in court would have to undertake certain risks and costs inherent in almost every litigation provides no support for an equitable estoppel defense under Seventh Circuit law. Accordingly, any proposed collective must be limited in time to only the period during which drivers have timely claims within the applicable FLSA statute of limitations.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's Motion for Conditional Certification should be denied in its entirety.

Dated:  October 20, 2022

/s/ *David D. Leishman*
Joel H. Spitz
State Bar No. 1001301
jspitz@mcguirewoods.com
Michael R. Phillips
State Bar No. 06225845 (IL)
mphillips@mcguirewoods.com
David D. Leishman
State Bar No. 6307957 (IL)
dleishman@mcguirewoods.com
MCGUIREWOODS LLP
77 West Wacker Drive, 41st Floor
Chicago, IL  60601
T: (312) 849-8100
F: (312) 849-3690

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of October, 2022, I caused the foregoing document to be filed with the Court's electronic filing facilities, which will provide service via e-mail upon Plaintiff's counsel of record.

/s/ David D. Leishman
David D. Leishman

166192353_1